[Civ. No. 20897. Second Dist., Div. One. Nov. 30, 1955.]

STAMATEO KAZANTENO, Respondent, v. CALIFORNIA-WESTERN STATES LIFE INSURANCE COMPANY (a Corporation), Appellant.

362

Frank M. Benedict and J. S. Heston for Appellant.

Sydney Tannen, Wright, Wright, Green & Wright, Loyd Wright, Dudley K. Wright and Edgar R. Carver, Jr., for Respondent.

ASHBURN, J. pro tem.*—Plaintiff Stamateo Kazanteno sued herein to establish his right to receive from defendant California-Western States Life Insurance Company, disability payments at the rate of $300 a month under certain accident insurance. He relied upon an oral agreement which the court found to be established, rendering judgment in his favor. Defendant appeals, urging two major propositions: (1) That the agent, William Economidis, who was found to have made the oral agreement, had no actual or ostensible authority so to do and (2) that the evidence is insufficient to support the finding that such agreement was made. As each of these contentions is a challenge to the sufficiency of the evidence, this court must accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence. ''And where appellant urges the insufficiency of the evidence to sustain the findings . . . the rule is that, 'Such contention *requires defendants to demonstrate* that there is no substantial evidence to support the challenged findings.' (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].) (Emphasis added.) It is said in *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183], that: 'It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deduction for those of the trial court.' '' (*Hartzell* v. *Myall*, 115 Cal.App.2d 670, 673 [252 P.2d 676].) The following statement of facts is molded accordingly.

On July 18, 1946, defendant insurance company issued to plaintiff a $10,000 life insurance policy (No. 564765) and two ''Good Will Builder'' policies, one an accident monthly income policy, and the other a health income policy. Each bore the same number as the life policy, 564765. Counsel refer to them as ''rider'' policies. The monthly payments were to be $200 under each income policy. In 1949 the company demanded return of the accident policy for the purpose of reducing the agreed payments to $100 a month and reclassifying plaintiff as a C risk, rather than A. These things were done. In August, 1951, plaintiff permitted the life policy

*Assigned by Chairman of Judicial Council.

to lapse and conversations began shortly looking to reinstatement of the policy and increase of the accident benefits from $100 to $300 per month. The immediate participants were the plaintiff and William Economidis, who concededly was a company agent. The conversations also included a proposal for plaintiff to take out a policy upon his son's life, with himself as beneficiary. Plaintiff refused to reinstate the existing policy or to buy one on his son's life unless the benefits on the two "Good Will Builder" policies were increased to $300 a month. Of course, the agent was interested. He testified: "I always keep after him." The home office of the company (which was in Sacramento) had expressed its approval of the increase in August, 1951. The vice president had written the Hawaiian agent (plaintiff was a resident of Honolulu) on August 21, 1951, that: "Subject to evidence of insurability satisfactory to the Company, we will now be prepared to consider increasing the Accident Income for Life and Health Income Benefits to $300.00 each. We will need the enclosed Form 10 and Non-Medical properly completed and returned to the Home Office together with the old Good Will Builder Policies. . . ." A copy was sent to Economidis, who in turn forwarded a copy to plaintiff, saying, with reference to the proposed increase of payments under the accident and health policies, "I would be more than glad to take care of this matter for you from here when you come back to Los Angeles again. I think I can give you something better." On September 24th, 1951, the vice president of the company sent a memorandum to the Hawaiian agency referring to the lapse of the life policy and saying: "We will, however, be prepared to consider reinstatement and increasing the Accident Income for Life and Health Income Policies to $300.00 a month each provided we receive a completed reinstatement Form 75 and a payment of $751.54 by October 18, 1951. For your convenience in discussing this case with Mr. Kazanteno, we have prepared the following figures: . . ." Copy of this communication was likewise sent to Mr. Economidis and its text shows that the letter was intended for discussion with plaintiff. The matter finally crystallized on June 25, 1952, after plaintiff had returned to Los Angeles from Hawaii. He told Economidis that he was ready to effect the $200 increase in the accident and health benefits and the agent said it would be necessary to reinstate the life policy No. 564765 and pass a physical examination. Plaintiff said that unless he got the $200 a month

increase he would not buy a policy on his son's life or reinstate his own life policy No. 564765 but would look elsewhere for his insurance. Economidis assured him that "if you have it in writing you will get it" and also that "I did have it in writing, he did write to me that he was going to get it for me, the company approved." Plaintiff understood this language to refer to the letters of August 21 and September 24, 1951 from the home office, and Economidis himself testified to the same effect; also, that he told Kazanteno that the letter was sufficient to be binding when he paid the premiums (amounting to $620.70). The letter of August 21, 1951, said that the company would require "the enclosed Form 10 and Non-Medical properly completed." Form 10 is a request for change in policy, but Economidis told plaintiff that Form 10 was no good because he had to pass a medical examination, being over 49 years of age; so on June 25, 1952 he had plaintiff sign an application for reinstatement of life policy Number 564765, using for that purpose company's Form 75. Plaintiff also had in force another life policy, Number 564934, and a policy loan agreement was executed by him in order to effect a loan upon that policy in the sum of $1,281.33 to provide the funds for the pending deal. At the same time he made an application for a policy upon his son's life, which carried a premium of $372.50. Economidis of his own volition, required the medical examination; it was had, probably on June 24th; it must have been successful or the policy on the son would not have been writtten as it was on July 16, 1952. Economidis said he would have plaintiff sign a Form 10, to keep it in case the company should inquire for it. He told plaintiff he wanted his check for $120 to cover additional premium for changing his classification, and that plaintiff should have it in before August 18; also, that he had plenty of reserve and his policy would automatically cover the $200 increase. The signing of Form 10 occurred a day or two after June 25. Kazanteno was leaving hurriedly for Honolulu because of a strike in Hawaii and Economidis sent the form to his hotel for signature. Plaintiff there signed it in blank and the agent later picked it up at the hotel, dated and signed it and held it until October 6, when he forwarded it to the home office.[1]

---

[1]The instrument bears date August 14, 1952, in typewriting. Also, under the caption "Additions or Amendments (*For Home Office use only*)" the following typewritten matter: "AIL and HI increased from $100 monthly to $300 monthly as of 10-18-52. Classification of AIL &

Before signing the various documents plaintiff said to the agent that if he did not get his increase in accident and health benefits he would not want the insurance, and Economidis said that the minute the 65 (meaning life policy No. 564765) was reinstated, the increase would go with it. Plaintiff was leaving for Honolulu and testified: "He told me as soon as they know the doctor's findings that he would notify me, that is all I had to do." Also, "I said, 'Is there anything else you want with me?' He said, 'No, everything is all right, as soon as we hear from the doctor, he is the main thing, if he passes you everything is all right, and if the doctor don't pass you there is nothing I can do.'" Economidis testified that he told plaintiff the increase would be effective at the time he paid the premium for the basic policy. Plaintiff believed these statements and relied upon them. On July 31, 1952, Economidis sent plaintiff a copy of a letter of July 30 from the manager of the premium collection department to himself, saying: "Our records show that Policy #564765 was reinstated July 10, 1952, and premiums and loan interest paid to July 18, 1952." Having made a package deal whereby reinstatement of the life policy was conditioned upon increase in the benefits of the accident and health policies, plaintiff was justified in believing that the increase had likewise been effectuated. At that time he had received no new policy, his old ones were in the hands of the company.

On August 25, 1952, while supervising the harvesting of pineapples, plaintiff suffered an accident which caused hospitalization for 60 days or more, and caused total disability which continued to the time of trial.

Economidis, the agent, had advised the company, through the Los Angeles office, of Kazanteno's desire for the $200 increase, and on June 25th he forwarded the life policy to the home office for reinstatement, which was actually effected on July 2d. On July 7th the company sent plaintiff notice of

HI is 'A'." There was evidence to the effect that the date was placed in the document by plaintiff after his return to Honolulu, but the testimony did not cover the quoted insertion concerning the AIL and HI increases. Kazanteno denied that he dated the document or returned it from Honolulu. This conflict bears only upon the credibility of plaintiff as a witness and was undoubtedly resolved in his favor by the trial judge, who was perhaps assisted to that end by a letter from the manager of the Los Angeles agency to the superintendent of the policy payment department, dated March 18, 1953, which says that Mr. Kazanteno "is a very high-class business man, not the type that is trying to take advantage of an insurance company or to distort the picture in any way."

reinstatement with premiums paid to July 18, 1952; also, notice of premium due on July 18, 1952. The premium thus billed on the reinstated life policy, No. 564765, $620.70, included the two Good Will policies for the period of July, 1951 to July, 1952. The $120 was to cover increase in benefits on the Good Will policies. Under date of August 14, 1952, plaintiff forwarded four checks in the amounts of $620.70, $535.70, $372.50 and $120. The two first mentioned were received in the Los Angeles office by August 15th and were cashed by the company on August 25, 1952. They covered the premiums on the two life policies, Numbers 564765 and 564934. The check for $372.50 represented the premium on the son's policy; it was payable to Economidis and appears to have been cashed by the company on September 22, 1952. The $120 check, payable also to Economidis was cashed by the company on September 22, 1952. (These two checks had been sent to one Chumas in Los Angeles, a friend of both plaintiff and the agent, and he had delayed delivery, and for some reason they had to be put through the bank twice, once on September 10th and again on September 22d.) The policy on the son's life was issued on July 16, 1952. On September 4, 1952, defendant company sent to plaintiff a notice that ''Your request for change has been put into effect'' and the notice refers to policies Numbers 564765 and 564934.

Economidis and the Honolulu agent both learned promptly of plaintiff's accident. Though the company denied liability for increased benefits, it retained the moneys, issued the son's policy, and reinstated the life policy, Number 564765, regardless of delay in payment of premium. On October 17, 1952, after knowledge of plaintiff's accident, it issued new ''Good Will Builder'' accident and health policies, carrying benefits of $300 a month, dated July 18, *1953* but effective October 18, 1952. On November 11, 1952, Economidis wrote plaintiff that there was no company liability in excess of $100 a month and explained the reason as it had been stated to him by the company: ''As you will recall, when you were here last July we decided to increase the benefits on this portion of your policy from $100.00 a month to $300.00 a month. The effective date of the policy was to have been July 18, 1952. Our trouble started when your check was missent to the Choumas Produce Company. We of course, in turn, were then late in forwarding the money on to the company. Our next problem arose when we failed to get

the yellow Form 10 signed, which was sent to you for your signature. The end result was that the company did not have all of the facts before them that they requested until early in October, and final approval was given for the increase, effective October 18, 1952." Economidis had explained on or before June 25th, that if necessary the reserve on the existing policy would take care of an automatic loan in the event the $120 premium was not paid. Concerning the alleged failure to get Form 10 signed, he testified that he sent two of them to plaintiff in Honolulu for signature but they were never received by plaintiff; that this was done because the one which had been signed in June had expired; that that one was in his own possession until October 6, 1952, when he transmitted it to the home office.

The letter of November 11th also said: "There is one bit of good news: The company, when approving your request for increased benefits, also reclassified you from Class 'C' to Class 'A', which will materially reduce your premium in the future. I am enclosing the refunded portion of your premium." This seems to refer to company's check of October 21, 1952, for $63.75, which plaintiff cashed in March, 1953, believing it to be a refund because of change in his classification. Actually, it was a refund due to issuance of the policy as of October 18, 1952, instead of July 18, 1952, as agreed; but the attached voucher meant nothing to plaintiff, especially in the face of Economidis' explanation of a different reason for the check.

So the company retained all of the premiums except the $63.75—a net amount of $1,049.45 (exclusive of the premium on Number 564934), issued the policies per application and undertook to make the new "Good Will" policies effective after the date of the accident instead of the date which its agent had represented and agreed upon, July 18, 1952.

The trial judge found, in paragraph IV: "It is true that on or about the first day of July, 1952 plaintiff and defendant entered into an oral agreement whereby defendant agreed to extend the Good Will Builder Accident Monthly Income for Life and the Good Will Builder Health Monthly Income for Life policy . . . for a period of one year commencing July 18, 1952 and ending July 18, 1953, and that the monthly benefits payable to plaintiff pursuant to the terms and conditions of said policies would be the sum of $300.00 per month, and that defendant, in consideration for plaintiff reinstating the Life Insurance policy . . . agreed to

issue its written policies containing the terms and conditions set forth in Exhibits L and M providing for $300.00 per month monthly benefits and providing for a term beginning July 18, 1952 and ending July 18, 1953 evidencing the oral agreement entered into by the parties on July 1, 1952." Also, that the new accident and health policies "were issued with an effective date of October 18, 1952 without the knowledge and consent of plaintiff and without the payment of consideration by defendant, and contrary to the agreement of defendant to issue said policies with an effective date of July 18, 1952, pursuant to the agreement mentioned in Paragraph IV above." Paragraph XVII: "It is true that defendant by its duly authorized agent on or about the first day of July 1952, represented and warranted to plaintiff that plaintiff had done everything necessary in order to extend the terms and provisions of said Good Will Builder Accident Monthly Income for Life policy for a period of one year commencing July 18, 1952 and ending July 18, 1953, and increasing the monthly benefits payable thereunder in the event of accident as therein defined from $100.00 per month to $300.00 per month and double that amount in the event of hospitalization during said period due to accident." Paragraph XVI: "It is true that defendant accepted the benefits of the contract between the parties set forth in Paragraph IV above with knowledge of the terms and conditions of the oral contract made by its agent, William Economidis." Paragraph XIX: "It is true that plaintiff relied on said representations and warranties by defendant's agent and refrained from procuring other accident monthly income for life insurance and traveled to the Territory of Hawaii in reliance thereon." Paragraph XX: "It is true that defendant's agent failed and neglected to forward the necessary forms to effectuate the increased benefits under the Good Will Builder Accident Monthly Income for Life policy to defendant's home office within a reasonable period of time." The court rendered judgment reforming the accident and health policies to make the effective dates thereof July 18, 1952, instead of October 17, 1952, awarding $8,100, with interest, as total of amounts due from August 25, 1952 to September 25, 1954, and declaring plaintiff's right to receive $300 a month "for so long as plaintiff shall be wholly and continuously disabled as a result of the injuries incurred on August 25, 1952."

First, as to the sufficiency of the evidence of the making

of the oral agreement. Both sides assert that California recognizes as valid oral agreements for insurance. (*Toth* v. *Metropolitan Life Ins. Co.*, 123 Cal.App. 185, 188 [11 P.2d 94].) And it appears that the rule is equally applicable to all phases of insurance contracts. "Insurance contracts may be made by parol. A parol contract of insurance, or agreement to issue, renew, or make an indorsement upon a policy, or to waive a provision or condition thereof, is valid and enforceable." (14 Cal.Jur., § 14, p. 428.) See also *Gold* v. *Sun Ins. Co.*, 73 Cal. 216 [14 P. 786]; *Farnum* v. *Phoenix Ins. Co.*, 83 Cal. 246, 260-261 [23 P. 869, 17 Am.St.Rep. 233]; *Mackintosh* v. *Agricultural Fire Ins. Co.*, 150 Cal. 440, 449 [89 P. 102, 119 Am.St. Rep. 234].) But the rule stated in the Toth case that the proof thereof must be clear and convincing is one for governance of the trial court, not the appellate tribunals. (*Edmonds* v. *H. W. Wilcox*, 178 Cal. 222, 224 [172 P. 1101]; *Ward* v. *Waterman*, 85 Cal. 488, 503 [24 P. 930]; *Penney* v. *Simmons*, 99 Cal. 380, 382 [33 P. 1121]; *Couts* v. *Winston*, 153 Cal. 686, 688-689 [96 P. 357]; *Estate of Pepper*, 158 Cal. 619, 622 [112 P. 62, 31 L.R.A.N.S. 1092]; *Wilcox* v. *Salomone*, 118 Cal.App.2d 704, 711 [258 P.2d 845], 19 Cal.Jur.2d § 468, p. 233.)

The facts above recited clearly constitute substantial support for the court's finding of the making of the oral agreement. "Where a valid parol contract of insurance has been entered into, the policy to be issued thereon is simply the memorial of the prior parol contract, and even though the policy be not delivered until after the loss occurs, the insurance is deemed effective from the time agreed upon in the parol agreement, irrespective of any delivery of the policy (*Crawford* v. *Transatlantic Fire Ins. Co.*, 125 Cal. 609 [58 P. 177]). 'If an agent, authorized to accept risks, accept a risk by parol, promising to deliver the policy, the insurance begins with the acceptance, and the contract in parol continues until the policy is delivered, when it is superseded by the policy' (*Ferrar* v. *Western Assur. Co.*, 30 Cal.App. 489, 491 [159 P. 609, 611])." (*Marderosian* v. *National Cas. Co.*, 96 Cal.App. 295, 303 [273 P. 1093].)

Next arises the question of whether Economidis had actual or ostensible authority to make such an agreement. If ostensible agency be found that is enough to support the judgment. Section 2300, Civil Code, provides: "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another

to be his agent who is not really employed by him.'' Section 2317: ''Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess.'' Economidis had a written agency contract which, standing alone, restricted his activities considerably, but plaintiff never saw it or knew its contents, and so it becomes immaterial to the consideration of the question of the existence of ostensible authority. Economidis had no connection with any other insurance company, for years he had handled Kazanteno's insurance with defendant and conducted the company correspondence with him, using company stationery for that purpose. Letters were actually written by Miss Hubbard, who was secretary and cashier of the Los Angeles agency, but she was told by Economidis the substance of what should be said; he signed the letters; following his signature were the typed words ''Los Angeles Agency.'' He had had a desk in the company office, then moved into his son's office which was on the same floor as the company, but, speaking of June and July, 1952, he said: ''I always get any desk there when I go in there.'' He had the run of the office. When the home office became interested in having Kazanteno reinstate his policy Number 564765 after its lapse in 1951, the information was sent to Economidis with the expectation that he would follow the matter with plaintiff and that he did do. Kazanteno had no contacts with the home office and practically none with other persons in the Los Angeles office. He would leave his policies with Economidis for safekeeping and they would repose in the company safe and were there when he left Los Angeles in June 1952. In 1951 plaintiff was late in forwarding his premium and Economidis advanced his own funds to cover the same; this was done with the assistance of Miss Hubbard and was known to the company, which later made a refund to him. Economidis undertook to overrule the home office on the need of a form 10 and insisted on a medical examination in connection with reinstatement. He undertook to make a package deal with plaintiff, reported it to the Los Angeles office and the home office, and the company took full advantage of it, received and kept the premiums, issued the son's policy promptly on July 16, 1952, reinstated Number 564765 on July 2, 1952, and gave notice of the fact to plaintiff. It accepted the $120 extra premium for increase of benefits on the Good Will policies and Economidis testified that he did not know of plaintiff's accident when those checks

were received. It developed that the company did insist upon a form 10, that Economidis had it in his possession but did not forward it until after the accident. This doubtless was primarily responsible for delay in formal action on increase of benefits under the accident policy. In letter of March 10, 1953, from the manager of the Los Angeles agency to the superintendent of the policy payment department it is said: "At that time he requested Bill Economidis, the agent in this case, to increase the Health and Accident Income benefits from $100.00 a month to $300.00 a month. Bill neglected to have a Form 10 signed, but did notify the Company of the intended change. By the time Bill had been informed that a Form 10 was required, Mr. Kazanteno had gone to Hawaii for what was intended to be a short business trip to look after his interests there. By the time Bill Economidis was able to communicate with Mr. Kazanteno and inform him that a Form 10 was required, Mr. Kazanteno had been injured, which was the injury for which the present claim has been made." Never, until after the accident, did the company do or say anything which smacked of rejecting any part of the package deal which Economidis had made for them. Plaintiff had every reason, after years of dealing with Economidis as the representative of the company, to believe and he did believe that that agent had authority to make the agreement which they reached on or about June 25, 1952. Cogent proof of this lies in the fact that plaintiff returned to Honolulu without trying to get the desired insurance elsewhere as he had threatened to do if the transaction was not consummated.

■ In attacking the finding of ostensible agency appellant quotes standard provision Number 2 of the outstanding accident policy, viz.: "No statement made by the applicant for insurance not included herein shall avoid the policy or be used in any legal proceeding hereunder. No agent has authority to change this policy or to waive any of its provisions. No change in this policy shall be valid unless approved by an executive officer of the Company and such approval be endorsed hereon." Counsel argue that plaintiff was thus charged with notice of limitation upon the authority of Economidis which precludes any finding of ostensible authority. In support of this contention counsel cite *Sharman* v. *Continental Ins. Co.*, 167 Cal. 117 [138 P. 708, 52 L.R.A.N.S. 670]; *Fidelity etc. Co.* v. *Fresno Flume etc. Co.*, 161 Cal. 466 [119 P. 646, 37 L.R.A.N.S. 322]; *Linnastruth* v. *Mutual*

*Benefit etc. Assn.*, 22 Cal.2d 216 [137 P.2d 833]; *Toth* v. *Metropolitan Life Ins. Co.*, 123 Cal.App. 185 [11 P.2d 94]; and *Lucas* v. *Metropolitan Life Ins. Co.*, 14 Cal.App.2d 676 [58 P.2d 934]. Examination of those cases discloses that, with the exception of the Lucas case which is not in point, each case deals with an alleged waiver of a term of the policy or of the application which occurred at the time of entering into the contract, a waiver of one of its specific terms; this, as presently shown, is substantially different in legal concept from a waiver made subsequent to the issuance and acceptance of the policy. Moreover, the absence of an ostensible authority is carefully noted in each case. For instance, the Sharman opinion says, at page 125: ''The contention solely is that because Wade was agent of the company—the ostensible agent at least—his knowledge bound the defendant. But Wade was merely a soliciting agent of the defendant. He had no authority, actual or ostensible, to waive conditions in the policy.'' In the Linnastruth case the court said, at page 218, that the application itself ''gave notice that he [agent] had no such apparent authority'' and at page 220 distinguished two cases upon the ground that they dealt with existing apparent authority. The Toth case, at pages 193 and 194, commented upon the absence of any ostensible authority and distinguished an Oklahoma case upon that ground. The Fidelity case, at page 471, says: ''It may be conceded that this was sufficient to clothe the agents with ostensible authority co-extensive with the business entrusted to them, in the absence of any notice of a limitation thereon. But the policies accepted and retained by defendant contained the provision that 'No condition or provision of this policy shall be varied or altered by any one unless by written consent of the president or secretary of the company.' This was a limitation upon the authority of agents of which defendant had notice.'' The language just quoted from the Fidelity decision relates to an application which was before the plaintiff and signed by it as part of the issuance of the policy. The situation at bar is somewhat different. The policy had been issued in 1946, it was in the possession of the insurance company at the time of the transaction in question, nothing occurred to point plaintiff's attention to that particular provision, and past dealings had instilled in him a confidence in Economidis and a belief that the company would do what he said it would.

But if the matter were to be tested by reference to the terms of said standard provision Number 2, it would not follow that plaintiff was charged with notice of its terms when dealing with the agent in 1952. ▪ "It must be presumed, ordinarily, that persons are familiar with the terms of written contracts to which they are parties, and in the absence of fraud they are justly bound by the provisions therein, but the rule should not be strictly applied to insurance policies. It is a matter almost of common knowledge that a very small percentage of policyholders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous—the one before us covering thirteen pages of the transcript—and in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary. The insured usually confides implicitly in the agent securing the insurance, and it is only just and equitable that the company should be required to call specifically to the attention of the policy-holder such provisions as the one before us. The courts, while zealous to uphold legal contracts, should not sacrifice the spirit to the letter nor should they be slow to aid the confiding and innocent." (*Raulet* v. *Northwestern etc. Ins. Co.*, 157 Cal. 213, 230 [107 P. 292].) This language was quoted in *Golden Gate Motor T. Co.* v. *Great American Indem. Co.*, 6 Cal.2d 439, 444 [58 P.2d 374] and in *Valdez* v. *Taylor Automobile Co.*, 129 Cal.App.2d 810, 816 [278 P.2d 91].

That the rule applicable to waivers attempted at the time of making the contract does not apply to subsequent waivers made by agents having actual or ostensible authority is well established.

*Farnum* v. *Phoenix Ins. Co., supra,* 83 Cal. 246, at 257, says: "A local insurance agent is presumed to have power co-extensive with the business intrusted to his care, and his powers will not be narrowed by limitations not communicated to the person with whom he deals. . . . A local agent having ostensible general authority to solicit applications and make contracts for insurance, and to receive first premiums, binds his principal by any acts or contracts within the general scope of his apparent authority, notwithstanding an actual excess of authority." At page 261, speaking of a policy requirement that waivers of conditions expressed in

the policy shall be in writing and endorsed on the policy, the court said: "It is also well settled that an insurance company cannot so limit its capacity to contract by general stipulations against waiver of conditions, or that its contracts or waivers must be in writing, that it cannot by its agents make an oral contract or an oral waiver not forbidden by the statute of frauds." Though the cases naturally fall into recognition of a general agent as having the necessary authority and a mere soliciting agent as having none, that distinction is not an inflexible one. The Farnum case, at page 261, says: "Whether or not any particular agent has the general power of the company to make an oral contract or an oral waiver of a condition, notwithstanding the provision in the policy requiring a writing, is a question of fact." As shown by the earlier quotation this language refers to ostensible as well as actual authority. To the same effect as the Farnum decision are *Mackintosh* v. *Agricultural Fire Ins. Co., supra,* 150 Cal. 440, 447-449; *Raulet* v. *Northwestern etc. Ins. Co., supra,* 157 Cal. 213, 233-234; *Guipre* v. *Kurt Hitke & Co.,* 109 Cal.App.2d 7, 16 [240 P.2d 312]. See also *Chase* v. *National Indem. Co.,* 129 Cal.App.2d 853, 859 [278 P.2d 68], and *Golden Gate Motor T. Co.* v. *Great American Indem. Co., supra,* 6 Cal.2d 439, 447, where waivers by general agents were involved. There is no merit in the contention that plaintiff was charged with knowledge of the terms of the existing accident policy in such manner as to preclude his relying upon the ostensible authority of Economidis to make the oral contract in question.

Appellant's counsel also argue that plaintiff's signing of form 10, the application for change in his policy, precludes his relying on Economidis' assurances. Reliance is placed on this language: "That the changed or added insurance hereby requested shall not be in effect unless and until the new policy or policies and/or supplemental agreement or supplemental agreements are delivered to and received by the Insured during his lifetime and good health. . . ." However, this provision falls within the rationale of the Farnum and other cases just cited. It relates to a change in an existing policy, not necessarily the issuance of a new one. In 1949 the change had been made on the face of the existing policy. Moreover, Economidis asserted to plaintiff that form 10 would not enter into the new deal, that a medical examination was necessary and form 75 required; also that plaintiff's signing of form 10 was but a formality, the document to be

held for use only in the event that the company persisted in its error as to the applicability of form 10. Economidis' ostensible authority covered this phase of the transaction as well as the others. ■ We again quote the Farnum opinion, 83 Cal. 246, at 257: "A local insurance agent is presumed to have power co-extensive with the business intrusted to his care, and his powers will not be narrowed by limitations not communicated to the person with whom he deals." The finding that Economidis had such ostensible authority is supported by substantial evidence and that ends the problem on appeal.

The accident occurred on August 25, 1952, and the action was filed on October 6, 1953. The trial ended July 20, 1954, and the judgment was filed on October 5, 1954. The court awarded plaintiff $8,100, plus interest, as the aggregate of payments due at the rate of $300 a month from August 25, 1952 to September 25, 1954. Plaintiff filed an amended complaint on June 23, 1954, but no supplemental complaint. ■ Appellant argues that in the absence of a supplemental pleading plaintiff was entitled to recover only the amounts which had accrued at the date of filing the complaint. The amended complaint at bar has five causes of action, two of which sound at law, and three in equity, the first being an action for declaratory relief. In the prayer addressed to each of the five counts the plaintiff seeks relief for "such period of time as plaintiff is permanently disabled due to said injuries sustained by plaintiff on or about August 25, 1952, and double such amount for such period of hospitalization of plaintiff due to such injuries."

■ Respondent correctly asserts that a court of equity will make a final disposition of the litigation governed by the circumstances as shown to exist at the time the decree is made rather than at the inception of the litigation, and a supplemental pleading is not necessary to that end. In *Del Riccio* v. *Photochart*, 124 Cal.App.2d 301, 316 [268 P.2d 814], an action which was partially in equity, the court said: "Under the pleadings herein and without the necessity of filing supplemental pleadings it was the duty of the trial court, under the circumstances here presented, to adjust the rights of the parties up to the time of the entry of judgment and to leave nothing open to further litigation. One of the attributes of equity is its power to do complete justice [citing cases]. We find no error in the scope of the accounting." *Union Oil Co.* v. *Reconstruction Oil Co.*, 20 Cal.App.2d 170, at 183 [66 P.2d 1215] : "With respect to the contention that

the award of damages included in the decree is outside any of the issues presented by the pleadings and that therefore the court lacked the power to make the award, it may be observed that a supplemental pleading might have been filed after the evidence produced during the trial of the action had disclosed what amount of damage respondent had suffered. (*McCarthy* v. *Gaston Ridge Mill etc. Co., supra,* 144 Cal. 542 [78 P. 7].) However, it must be borne in mind that we are here considering an action in equity where the relief administered is such as the nature of the case and the facts as they exist at the termination of the suit demand. In such a situation a supplemental complaint is not required to apprise the court of those facts which have occurred since the filing of the original complaint and which have an evidentiary bearing upon the facts in issue in the action as originally instituted. The allegation of such subsequent facts would be surplusage and not consistent with the familiar equitable maxim which declares that equity will not require the performance of an idle act. (*Collins* v. *Sargent,* 89 Cal.App. 107 [264 P. 776].) We conclude therefore that, under the circumstances here presented, the trial court was not without power to make an award of damages that were purely incidental to the equitable relief originally sought and that no reversible error was committed in making such award in the absence of a supplemental complaint alleging the existence of facts which occurred subsequent to the filing of the original complaint.'' To the same effect see *Kohn* v. *Kohn,* 95 Cal.App.2d 708, 716 [214 P.2d 71] ; *Rosicrucian Fellowship* v. *Rosicrucian etc. Church,* 39 Cal.2d 121, 135 [245 P.2d 481]. Likewise, in a law action it is proper to render judgment for all installments of the debt which have matured at the time of judgment where no plea in abatement based on prematurity of the action as to unaccrued installments has been filed. (*Kelley* v. *Upshaw,* 39 Cal.2d 179, 186-189 [246 P.2d 23].) There was no such plea here. There was no error in granting judgment for installments due at the time of its rendition.

Having considered all the arguments presented by appellant, we find no error in the judgment.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.