[Civ. No. 24394. Second Dist., Div. Three. Feb. 27, 1961.]

APPAREL MANUFACTURERS' SUPPLY COMPANY (a Corporation), Plaintiff and Appellant, v. NATIONAL AUTOMOBILE AND CASUALTY INSURANCE COMPANY (a Corporation) et al., Defendants and Appellants.

446

McBain & Morgan, Victor S. Cogen and Angus C. McBain for Plaintiff and Appellant.

William H. Levit, Bert W Levit and Long & Levit for Defendant and Appellant National Automobile & Casualty Insurance Company.

Hindman & Davis and E. Eugene Davis for Defendant and Appellant Yorkshire Insurance Company of New York.

FORD, J.—This is an action for declaratory relief brought by Apparel Manufacturers' Supply Co. against two insurance companies, National Automobile and Casualty Insurance Company and Yorkshire Insurance Company of New York Reference will be hereafter made to the parties as, respectively, Apparel, National, and Yorkshire.

The plaintiff, a California corporation, was the owner of merchandise, furniture, fixtures and equipment located at 927 South Los Angeles Street, in Los Angeles. On December 1, 1955, defendant National issued a "commercial block" insurance policy in the amount of $100,000 to Apparel covering such property. "Commercial block" coverage includes the risk of loss through fire together with the risk of loss by other means. By its terms the policy was to be in effect for a period of five years but it could be cancelled by the company or by the insured upon the fulfillment of certain specified conditions.

The insurance with National was procured for Apparel by one Louis Harrow, who handled Apparel's insurance matters. Harrow was also an agent of the defendant National and of other insurance companies, but not of defendant Yorkshire. In January of 1957, between the 10th and 15th of that month, John Rossi, inland marine insurance manager for Kleiner, Fields and Burton, a general agent for defendant National, informed Harrow that National wanted to be relieved of the risk on Apparel's policy because of the history of losses related thereto. National did not at that time, or at any time subsequent thereto, give formal notice of cancellation in compliance with the terms of the policy. Upon receiving such in-

formation from Rossi, Harrow set about to procure insurance in another company to replace the National policy. After a number of unsuccessful attempts, Harrow, through his employee Claire Murray, contacted Sigmund Geisendorfer, an employee in the office of Deans and Homer, a managing general agent for Yorkshire. There is a conflict in the evidence as to what transpired between Geisendorfer and Miss Murray and between Geisendorfer and Harrow. However, the trial court found that Yorkshire (through Geisendorfer) and Apparel (through Harrow) entered into an oral agreement of insurance.

On February 11, 1957, at 10:15 p. m., Apparel sustained a fire loss with respect to its property. It was stipulated by all the parties, and the court found, that such property in an undamaged state was of the sound value and reasonable cash and market value of $126,817.85. It was further stipulated, and found by the court, that such property was damaged by the fire to the extent of $108,669.93. The parties stipulated, and the court found, that Apparel had either performed all the terms and conditions on its part to be performed under each of the said contracts of insurance or that such compliance had been waived.

The trial court found that ''there has been and still is an actual controversy between plaintiff and defendants National and Yorkshire and between said defendants in that with respect to plaintiff's aforesaid loss National contends that at the time of the aforesaid fire its policy of insurance had been cancelled and replaced by insurance in Yorkshire and Yorkshire had sole liability for the loss, and Yorkshire contends that at the time of the aforesaid fire, first, that it did not have any insurance in effect but National's said policy was in effect and National had sole liability for the loss, and second, that if Yorkshire had insurance in effect National's policy was also in effect and the amount of plaintiff's loss and damage should be divided between said defendants, subject to the application of policy coinsurance clauses, if any.'' With regard to this controversy the trial court made findings that ''defendant National's policy was in full force and effect at the time of said fire and loss and damage and further finds that Yorkshire also had insurance in effect during all said times . . .'' Apparel's insurance with Yorkshire was found to be ''under a so-called 'commercial block' form in

substantially the same form as defendant National's aforesaid policy against all risks of loss and damage to said property, including the risk of fire, in the sum of $100,000.00 for a term commencing February 6, 1957, and continuing until receipt of a written agreement of insurance." The trial court made a further finding that: "The premium to be charged was the usual premium for such insurance in Los Angeles, California . . . ." Finally, the court determined that "the defendants' respective insurance contracts being of equal amount, plaintiff's loss of $108,669.93 is to be borne equally by said defendants and National's share of liability therefor is $54,334.96 and Yorkshire's share of liability therefor is $54,334.97." The court gave judgment accordingly. All parties have appealed from the judgment. The position of each insurer on this appeal will be discussed.

Yorkshire's first contention is that the trial court's finding that an oral contract was entered into between Apparel and Yorkshire is not supported by the evidence. The evidence bearing upon the existence of an oral contract, considered in the light most favorable to Apparel, will be stated.

M. Claire Murray, an employee in the Harrow office, testified that after that office received notice of National's desire to be relieved of the Apparel risk, she called Mr. Geisendorfer in an attempt to get coverage for Apparel. The date of this call was February 5, 1957. She had contacted him on many occasions previously in his underwriting capacity when she was employed in another insurance office. Miss Murray informed Geisendorfer of the nature of the risk, and asked him "if he could bind the coverage" until such time as he could come out and see Mr. Harrow and talk to him regarding writing insurance for their office. She testified that at this time she asked for coverage for Apparel for fire, extended coverage, vandalism, and malicious mischief on the stock and equipment located at the insured's address. She informed Geisendorfer that another company or other companies wanted to be relieved of the risk. Geisendorfer agreed to bind the risk, and she made an appointment for him to come out to see Mr. Harrow and discuss the particular insurance coverage with him.

Both Mr. Harrow and Miss Murray testified as to the conversation which took place the next day, February 6, 1957, when Geisendorfer arrived at the Harrow office. Harrow testified that Mr. Geisendorfer came to his office around noon

on that day. Miss Murray introduced Mr. Geisendorfer to him, and he explained the situation to Geisendorfer, including the fact that the firms had suffered two recent losses. Geisendorfer complimented him on his frankness and said, ''Well I am binding the risks now, and I am going to stop by tomorrow morning and look at those risks.'' He stated that he had been in the building where Apparel was located on a previous occasion. Harrow testified, ''Just then, after he made that statement, I says to him, 'Mr. Geisendorfer, do I understand that I am bound for $100,000 of all-risk commercial block for Apparel Manufacturing Supply Co.?' He smiled and he said, 'Yes.' I said, 'I am a very technical person, and I would like you to answer me in the presence of Miss Murray.' I didn't say in the presence of Miss Murray. I meant that while Miss Murray was there I wanted him to answer me.'' He then testified that he asked a similar question with respect to Cal-Button and Amsco Shoulder Pad,[1] and in each case Geisendorfer answered, ''Yes.'' He had informed Mr. Geisendorfer of the nature of the property to be covered prior to eliciting these answers. He had discussed with Geisendorfer the type of property to be insured, the fact that he wanted $100,000 coverage for Apparel on equipment, stock and fixtures, the specific address, and the type of operation conducted. Geisendorfer left ''commercial block'' application forms with him, which were to be completed so that the company could issue the policies and determine the premium.

Miss Murray's testimony concerning the February 6 meeting at the Harrow office was substantially similar. She introduced Mr. Geisendorfer to Mr. Harrow. They discussed the possibility of an agency agreement between Deans and Homer and Harrow. Mr. Harrow then discussed with Geisendorfer the matter of the Apparel insurance. He said he would like to have ''commercial blocks'' for the three firms, $100,000 coverage for Apparel, the same amount of coverage for Cal-Button and $35,000 coverage for Amsco Shoulder Pad for stock and equipment. Mr. Geisendorfer said he would accept

[1]Apparel was located in the same building with two other corporations, Cal-Button Corporation, and Amsco Shoulder Pad Company. The three were under common ownership and management. The same man, Mr. White, served as president and general manager of all three. Their insurance was handled together; hence quotations from the reporter's transcript will contain reference to all three corporations, although insurance for Apparel alone is involved in this action.

these risks for commercial block policies for the above amounts. He had brought with him commercial block applications which he gave to Mr. Harrow; he asked Harrow to have such applications completed. She could not give the exact words he used to bind the insurance. Mr. Harrow informed Geisendorfer that the companies presently bound wanted to be relieved of the risk, due to losses. That was the gist of their conversation.

Mr. Geisendorfer's testimony may be summarized as follows: He worked for Deans and Homer, a general agent for Yorkshire. At the time of the fire he was working in the Los Angeles office as a special agent; he had previously been an underwriter in the Los Angeles office. In the course of his work as a special agent, brokers or agents had verbally requested him to bind a particular risk, but he was not normally the one to advise others whether or not a particular risk was bound. When asked what words he ordinarily used in the field when indicating a verbal binder, he stated that expressions were used such as the following: ''You are covered on the line,'' and ''We have bound it.'' He testified that Miss Murray called him on February 5, 1957, and said that she had some risks down on Los Angeles Street as to which they were interested in writing a commercial block; she gave the names and addresses, amount of coverage desired and kind of property to be covered; she asked ''if we could bind fire, ECE and vandalism,'' 90 per cent average cost; she gave him information as to the gross sales of the companies. In his deposition, he testified that Miss Murray asked him if he would bind this coverage and he said he would bind it overnight. At the trial he testified he might have bound it overnight, but that he did not recall. On the 6th day of February, he went to Harrow's office. Mr. Harrow, Miss Murray and Harrow's son were there. Harrow's son left. Geisendorfer asked questions about the risks which Harrow answered. Harrow told him the company to be insured, the type of property to be insured, the amount of insurance coverage for each company, the type of building, and the present insurance situation. Geisendorfer testified that Harrow might have asked him if he could bind the risks. He testified in his deposition that he did not recall what he answered in response to that question, but at the trial he stated that he did not say that he would bind the risks. At no time did he

inform Harrow or Miss Murray of any limitation on his authority. He left commercial block applications with Harrow on his first visit, and he inspected the risks on the 7th of February. After inspecting the premises, he did not inform Harrow that he would not accept the risk. He returned to the Harrow office on the 8th of February and discussed the risk with Miss Murray. He inquired of her whether the applications were completed and she stated they were not.

Aside from what has heretofore been noted, there was evidence bearing on the extent of Geisendorfer's authority an an employee of Deans and Homer. It was stipulated that Deans and Homer "were the exclusive managing agents for the Yorkshire in this territory." In addition, Deans and Homer were general agents or managers for other companies. It was further stipulated that Deans and Homer had authority to underwrite commercial block risks for Yorkshire in the State of California. John F. Holstius, the manager of the inland marine insurance department of Deans and Homer, testified in substance that he was the chief underwriter for the inland marine insurance business which included commercial block risks. He further testified that commercial block coverage is occasionally effected orally. Geisendorfer testified that before he became a special agent he had been an underwriter for Deans and Homer. In the latter capacity, he talked to agents and brokers who desired to place insurance, including commercial block insurance. In such work in the office, he had occasion to tell a broker or an agent that a risk was bound. When he became a special agent, his duties were different from those of an underwriter; he was directed to travel around and visit the various agents and brokers. It was his duty to produce insurance business for Deans and Homer and its companies. As special agent, he did have brokers or agents request that he orally bind a particular risk, but he would not normally be the one who would advise the broker or agent whether the risk was bound. But the witness thereafter testified as follows: "Q. . . . Let's suppose you visited an agent or broker, and he verbally while you were in his office asked you to bind a risk. Who would normally advise him whether the risk was bound or not? . . . The witness: It would be the manager or an underwriter or a special agent, if he would be in the office. . . . Mr. Levit [attorney for National]: I don't know whether you understood the question. Q. As I understand your answer, if the request came to the office,

then the advice might be given to the agent or broker by either the manager or underwriter or special agent? A. Correct. Q. So it might be you if you happened to be there at that time? A. Yes. Q. I am taking another situation where you go out in the field and visit this agent or broker, and he asks you to bind a risk. Who would normally be the one in that situation to advise him? A. Well, depending, usually the same answer." The witness then related the kind of language used by him in such situations to indicate an oral binder. With respect to his first conversation with Miss Murray, he said that he "might have" told her in effect that he would bind the risk overnight. During the course of the trial, Yorkshire offered no evidence of a limitation on the authority of Geisendorfer as a special agent to agree orally to immediate insurance coverage.

An appellate court must accept as established all facts and all inferences favorable to the prevailing party which find substantial support in the evidence. (*New* v. *New,* 148 Cal.App.2d 372, 383 [306 P.2d 987].) Accordingly, in considering the contentions of Yorkshire, we cannot disregard the determination of the trial court that Geisendorfer did orally agree with Harrow that there was immediate insurance coverage as requested for Apparel and that such an agreement was within the scope of his authority. Geisendorfer was presumed to have powers coextensive with the business entrusted to him; his powers could not be narrowed by any limitation not communicated to persons with whom he was expected to deal. (See *Frasch* v. *London & Lancashire F. Ins. Co.,* 213 Cal. 219, 223 [2 P.2d 147]; *Kazanteno* v. *California-Western States Life Ins. Co.,* 137 Cal.App.2d 361, 376 [290 P.2d 332]; *Guipre* v. *Kurt Hitke & Co.,* 109 Cal.App.2d 7, 13-14 [240 P.2d 312]; *Cronin* v. *Coyle,* 6 Cal.App.2d 205, 212 [44 P.2d 385]; *Lumbermen's Mut. Ins. Co.* v. *Slide Rule & Scale Eng. Co.,* 177 F.2d 305, 309; 27 Cal.Jur.2d, Insurance, § 138.)

A more difficult problem is presented by Yorkshire's contention that no enforceable oral agreement of insurance came into being in favor of Apparel because, it asserts, there was "no meeting of the minds on the company insuring," there was "no statement of the premium or of the basis and rates upon which the premium was to be determined," the "duration of the alleged contract in point of time was not agreed

upon," and the "oral negotiations were merely preliminary, looking toward a possible future contractual relationship."[2]

The problems presented are akin to those which were before the court in *Parlier Fruit Co.* v. *Fireman's Fund Ins. Co.*, 151 Cal.App.2d 6 [311 P.2d 62], wherein the trial court had given judgment for the defendant insurers solely on the ground that the oral binding coverages were each "too uncertain and indefinite as to the amount of insurance, type of insurance to be issued or the terms thereof, and premium to be paid, to be enforceable; and that it is essential for a binding coverage to be enforceable that the terms of the policy to be selected be agreed upon when the binder is issued." (P. 18.) ■ In holding that the parol contract of insurance there involved was enforceable, the appellate court in the Parlier case relied on *Lumbermen's Mut. Ins. Co.* v. *Slide Rule & Scale Eng. Co., supra,* 177 F.2d 305, and (at pp. 19-20 of 151 Cal.App.2d) quoted from Corpus Juris Secundum (44 C.J.S., Insurance, § 230, p. 957) as follows: "For the sake of convenience, contracts of insurance sometimes exist in two forms: (1) A preliminary contract intended to protect the applicant pending investigation of the risk by the company or until the policy can be properly issued. (2) The final contract or policy itself. This preliminary contract is of the greatest importance, for if the applicant could not be made secure until all the formal documents were executed and delivered, the beneficial effect of the insurance system would be greatly impaired. . . . An agent possessing authority to bind the company by contracts of insurance has authority to bind it by a preliminary or temporary contract of insurance. . . ."

■ We turn directly to the claim with respect to the failure to designate a particular company as the insurer in the conversations which were had between Miss Murray or Harrow and Geisendorfer. Carl Homer of Deans and Homer

---

[2]Yorkshire's attack is directed toward the following portion of the findings of fact: "On or about February 6, 1957, through said Deans & Homer acting within the scope and course of its authority in behalf of defendant Yorkshire, Yorkshire made and entered into an oral agreement of insurance with plaintiff by the terms of which Yorkshire insured plaintiff against loss and damage to plaintiff's property . . . under a so-called 'commercial block' form in substantially the same form as defendant National's aforesaid policy against all risk of loss and damage to said property, including the risk of fire, in the sum of $100,000.00 for a term commencing February 6, 1957, and continuing until receipt of a written agreement of insurance."

testified as follows: "Q. Wasn't the Yorkshire determined to be the company, the front company,[3] before the loss occurred? A. Yes. . . . Q. In your usual course of business, is that correct? A. That is right. Q. With the Yorkshire as the company to write the policies for the insured? A. Yes. . . . Q. . . . From your knowledge of this matter, the way it was handled, if there was any binding of this insurance prior to the loss, it was in the Yorkshire? A. That is right." ▮ In rejecting an argument similar to that here made, the court in the Parlier case said (151 Cal.App.2d, at p. 24): "As to the contention that the parties' minds did not meet upon the names of the companies to be bound (the same contention is made in our case) the court said (p. 309) [*Lumbermen's Mut. Ins. Co.* v. *Slide Rule & Scale Eng. Co., supra,* 177 F.2d 305]: 'When the agent represents several companies and selects certain of them to be bound by the risk, he is contracting for undisclosed principals. Each of the companies he represents has intrusted him with the agency, and must be held to have given him authority as such agent to select it as the one to bear the risk. Such authority springs inevitably from his authority to make insurance contracts. The insured cannot be permitted to suffer because the agent fails to disclose at the time of making the contract which of several principals he binds.' " (See also *Sholund* v. *Detroit Fire & Marine Ins. Co.,* 172 Wash. 111 [19 P.2d 395, 396-397].)

▮ With respect to the subject of the premium, Yorkshire makes reference to the following testimony of Harrow: "Commercial block policies are policies of innumerable hazards, and the rate is based upon an application with all the details, background and exposures of that particular risk; and the rate can only be promulgated after all this information is digested and the premiums evaluated and combined." It is undisputed that Geisendorfer quoted no specific rate to Harrow. Harrow further testified that "rates cannot be quoted on a commercial block policy." The records of Yorkshire indicate that the risk was treated as a "Bureau Block" risk. Holstius testified that the Pacific Fire Rating Bureau determined the precise form of policy to be used for such a risk.

---

[3] Mr. Batzer of Deans & Homer testified in substance that the "front company" is the company that writes the policy but does not carry all of the risk, part of the risk being actually undertaken by other companies by way of reinsurance. A similar explanation was given by the witness Holstius.

Such a policy would contain the provisions of the California standard form of fire insurance policy to which would be added the commercial property endorsement prescribed by that Bureau. The application therefor is submitted to the Bureau which then determines the rate for the risk which would be the same for any bureau company submitting an application. To obtain such a rate, all of the data that is required by the application must be submitted. However, Holstius further testified that Deans and Homer were contemplating the writing of the policy on a "judgment-rating" or "non-bureau" basis. There was also other testimony as to the problems involved in determining the premium for the particular kind of insurance.

The contention of Yorkshire that there was no binding contract because the premiums had not been determined cannot be sustained. The trier of fact was justified in finding an implied promise on the part of Apparel to pay all reasonable charges for the insurance coverage. (See *Hurd* v. *Maine Mut. Fire Ins. Co.*, 139 Me. 103 [27 A.2d 918, 923].) ▮ In the Parlier case it was said (151 Cal.App.2d, at p. 22): "The premium rate would necessarily be the company's rate for the coverage received. There is implied an agrement to pay the usual premium. (44 C.J.S. 959.) See *Globe & Rutgers Fire Ins. Co.* v. *Liberty Bell Ins. Co.*, 16 Cal.App.2d 76 [60 P.2d 200]; 'The law seems to be well settled that a "binder" contract or "keep covered" contract need not express any consideration, there being an implied agreement to pay the usual premium.'" (See also *Law* v. *Northern Assurance Co.*, 165 Cal. 394, 403 [132 P. 590]; *Cummings* v. *New England Ins. Co.*, 266 F.2d 888, 890[4]; *Globe & Rutgers Fire Ins. Co.* v. *Draper*, 66 F.2d 985, 988.)

▮ Yorkshire's contention that the oral agreement was not enforceable because there was "no agreement on the duration of the policy in point of time" is also answered in the Parlier case. It was there said (151 Cal.App.2d, at p. 22): "Obviously the period here was the time between the making

[4]In the Cummings case, the court said at page 890: "We concur in the view of the trial court that the failure to discuss the amount of the premiums under the circumstances here set out would not prevent the binder from becoming effective. Nor was the absence of a rate. The Mississippi Rating Bureau determines the rate, and the course of dealing between the parties warranted a finding that the policy was ordered and would be delivered at the proper rate and for cash or on credit extended by the Andrews' agency."

of the oral binder agreement and the time when the policy would be agreed upon and received, or rejected. (44 C.J.S. 964, *supra*.)'' The fact that it was contemplated that a written application would be submitted does not affect such determination. As said in *Hurd* v. *Maine Mut. Fire Ins. Co., supra,* 139 Me. 103 [27 A.2d 918, at p. 922] : ''The mere fact that an application was made for a policy of fire insurance, does not preclude the applicant from showing that at the time he signed the application he was temporarily insured pending acceptance or rejection of his application. . . . Whether or not an oral contract for temporary insurance was made, was a question of fact for the jury (1 Cooley's Briefs on Insurance, page 560), and, since such contracts are usually of a very informal nature (32 C.J., page 1100), all of the facts and surrounding circumstances must be taken into consideration in determining that question.'' The court further said [27 A.2d, at p. 923] : ''While neither the phrase 'temporary insurance' nor 'insurance pending decision on the application' nor 'preliminary insurance' was used, yet the significant word 'covered' was used. And whenever that word is used in the fire insurance business, to describe a factual condition, as distinguished from a mere expression of opinion, it means that the property described is temporarily insured for a reasonable length of time, according to the terms of policies usually issued on such property, until the applicant is notified of the rejection of his application or the acceptance thereof followed by the delivery of a proper policy. . . . That temporary insurance, however, would terminate upon the delivery and acceptance of the policy applied for.''

What has heretofore been said indicates that there is no merit in the contention of Yorkshire that the ''oral negotiations were merely preliminary, looking toward a possible future contractual relationship.'' Yorkshire asserts : ''Harrow knew that a contract for commercial block insurance could not be consummated except after a written application with all the numerous items of information that differentiated this type of insurance from other insurance.'' As to a similar contention, it was said in the Parlier case (151 Cal.App.2d, at p. 21) : ''Defendants contend that there are five types of use and occupancy insurance, and therefore the subject matter was indefinite as neither Vito nor Babish knew of the best type available to plaintiff. But such fact

did not invalidate the oral binder. The accepting defendants must have known the type when they accepted Babish's request for coverage. It necessarily would be the type and form usually issued to an insured in the same type and class of business as plaintiff. 'Where, however, the preliminary oral contract or binding slip does not specify the terms and conditions, it is a general rule that the parties will be presumed to have contemplated a form of policy containing such conditions and limitations as are usual in such cases,' (44 C.J.S. 965) not the highest form of coverage which could be obtained but one reasonably suited to plaintiff's situation. To hold otherwise would mean that parol binders although recognized by law to be valid, are only valid if the insurance company wants to consider them so. Thus, when the permanent policy is issued and the insured charged a premium for the period covered in the binder, a fraud would be consummated, as the insured would be charged the back premium, even though he really had no protection during the period charged for.'' Helpful reasoning is also found in *Shumway* v. *Home Fire & Marine Ins. Co. of Calif.*, 301 Mass. 391 [17 N.E.2d 212, at p. 214] : ''The defendant also contends that no oral contract of insurance was proved. Upon all the evidence the jury were warranted in finding that the defendant, through its agent, had made such a contract of insurance with the plaintiff upon his house, in the amount of $4,000, and that the risk had immediately attached and was to continue until a policy which was expected to be issued in a few days could be delivered to the plaintiff. [Citations.] . . . Upon the evidence, it is clear that the rate was not known to the parties, and Noble had written to the special agent to ascertain not only the rate but also how to describe in the policy the building which was to have different locations until it finally arrived at its destination. The building, however, was insured, when the loss occurred, for a reasonable time. An oral agreement for insurance is not rendered invalid because more information must be had before a policy can be written. [Citations.] The declaration of Noble that 'The building is covered' tended to show that the parties had so far as necessary agreed upon all the essential terms of their contract.''

We find no error with respect to the determination of the trial court that at the time of the fire Apparel had enforceable insurance coverage with Yorkshire. The facts above

recited constitute substantial support for that conclusion.[5] Accordingly, we turn to the problem of whether National was still bound under its policy or whether the Yorkshire coverage had been substituted for the National policy in such a manner as to relieve National of liability.

From the evidence, the trial court reached the conclusion that the National policy "had not been cancelled or cancelled and replaced by insurance in defendant Yorkshire but that defendant National's policy was in full force and effect at the time of said fire and loss and damage. . . ." Before discussing the evidence underlying that conclusion, reference will be made to ways in which liability could be terminated under such a policy. Under the terms of the policy, it could be cancelled by National by mailing or delivering to Apparel written notice "stating when not less than five days thereafter such cancellation" should be effective. No such formal cancellation was attempted in the present case. However, independently of the express terms of the policy, a policy may be terminated by mutual agreement of the parties; such an agreement may be express or it may be implied from the circumstances of the particular case. ▮▮ "It is a self-evident proposition that a contract of insurance may be as readily rescinded, as it was made, by the mutual agreement of the parties or their authorized representatives; and while the surrender of a policy of insurance by the insured and its acceptance by the insurer is usually *prima facie* evidence of cancellation, yet a formal physical surrender is not absolutely necessary to a rescission and cancellation of the contract." (*Stevenson* v. *Sun Insurance Office*, 17 Cal.App. 280, 288 [119 P. 529]; see also *Kast* v. *Dubuque F. & M. Ins. Co.*, 112 Cal.App. 125, 131-132 [296 P. 324]; note, 152 A.L.R. 95, 97-99.)

▮ Cancellation by mutual consent may occur where one policy is substituted for another. (*Strauss* v. *Dubuque F. & M. Ins. Co.*, 132 Cal.App. 283, 292-293 [22 P.2d 582].) "Generally, the procurement of new insurance with intent that it shall take the place of existing insurance, and with no intent to thereby acquire additional insurance, constitutes

---

[5]With respect to parol contracts of insurance, it was stated in *Kazanteno* v. *California-Western States Life Ins. Co.*, *supra*, 137 Cal.App.2d 361, at page 370: "But the rule . . . that the proof thereof must be clear and convincing is one for governance of the trial court, not the appellate tribunals. [Citations.]"

an effective voluntary cancellation of the existing insurance, in which case the insured may not recover under both policies, despite physical possession, by the insured or his agent, of the original policy. . . ." (27 Cal.Jur.2d, Insurance, § 293; see *Home Ins. Co.* v. *Campbell Mfg. Co.,* 79 F.2d 588, 590-591.)

While a mere employment to secure insurance does not carry with it authority thereafter to cancel such coverage, other facts may show that authority to agree to a cancellation on behalf of the insured has been conferred on an agent or broker. (*Stevenson* v. *Sun Insurance Office, supra,* 17 Cal. App. 280, 286.) This is illustrated by *Rose Inn Corp.* v. *National Union Fire Ins. Co.,* 258 N.Y. 51 [179 N.E. 256, 83 A.L.R. 293], wherein the court said: "It is a principle of almost universal acceptance that where an assured has applied for insurance to an agent, having authority to write policies for many companies, has left to the agent the selection of the companies, with instructions to maintain the insurance in an amount stated, and the agent has undertaken so to act, the agent, upon notice from his companies to cancel, has power to waive for the assured the five-day period of cancellation, to cancel the policies at once, and immediately to write new policies in other companies for the assured, so that the new policies become at once effective." In *N. Pelaggi & Co.* v. *Orient Ins. Co.,* 102 Vt. 384 [148 A. 869, at p. 873], the court said: "But where such agent is authorized by the assured, not only to place the insurance, but also to keep the property covered, he has implied authority to do whatever is reasonably necessary to accomplish that object, and he may waive the five-day clause, accept cancellation and substitution—all without notice to or consent by the insured." (See also *Warren* v. *Franklin Fire Ins. Co.,* 161 Iowa 440 [143 N.W. 554, 555]; note, 83 A.L.R 298, 311.)

National contends that the evidence affirmatively establishes that the Yorkshire insurance coverage was acquired to take the place of the National policy, that there was no intent thereby to acquire additional insurance, that all parties so understood, and that Apparel's agent informed National that it was "off the risk" as of the date of the oral binder with Yorkshire. National argues that, accordingly, the trial court should have determined that the National policy had been cancelled by substitution prior to the fire. In the consideration of the problem thus presented, it is necessary to review the pertinent evidence.

On this appeal, no question is or could be raised as to the authority of Harrow, as agent for Apparel, to substitute one policy for another. The president of Apparel, who was the person in charge of insurance matters for his company, testified that Harrow was his insurance advisor. He directed Harrow to keep Apparel and its related companies "fully covered with the proper insurance at all times." He further said that Harrow was to do whatever was necessary; he left the selection of insurance companies, the type of coverage, and the renewal of policies to the judgment of Harrow. Harrow was to keep Apparel fully covered in an amount of insurance "according to the way the books reflect"; at the end of the fiscal year and at such other times as it was necessary there was a discussion as to what the books disclosed as to amounts or values. There was no discussion as to premium charges. There had been instances where Harrow, "during the policy-period of a particular policy," would send Apparel a policy in a different company and request the return of the old policy; Apparel never raised any objection to that procedure. Where there was to be such a replacement, Harrow was instructed that there was to be no lapse of coverage at any time; in such transactions there had never been an instance where a double-premium charge had been incurred. With respect to insurance on the stock and equipment of Apparel, Harrow was instructed "to carry $100,000 insurance" but the type of insurance was left to his judgment. As to what he was told by the president of Apparel, Harrow testified as follows: "He merely advised me that it was my responsibility to keep him adequately covered, and all opinions and decisions were to be mine." There had been instances where a company which was carrying a risk for Apparel requested to be relieved of liability; in such cases Harrow replaced the insurance without any instructions from Apparel's president with respect thereto.

Whether there was a cancellation of the National policy by mutual agreement prior to the fire was a question which had to be resolved by the trial court primarily upon a consideration of the testimony of John Rossi and of Harrow. Rossi testified that he was inland marine insurance manager for Kleiner, Fields and Burton who were general agents for a number of companies, including National. Kleiner, Fields and Burton had "complete authority to accept and cancel" commercial block risks. In January 1957, Rossi asked Harrow

to make arrangements to relieve National of the Apparel and related risks. Several additional conversations thereafter occurred. On January 31, 1957, Harrow told him that National was "off of the perils of fire, extended coverage, vandalism and malicious mischief . . . as of February the 1st, 1957, at 12:00 o'clock noon." Within one or two days thereafter, he was told by Harrow or someone in his office that National was "back on" for such perils but that Harrow was continuing to seek replacement coverage. On February 5 at about 4:20 p. m. Miss Murray of Harrow's office told Rossi that National was "off of" such perils effective that date. He recalled no further conversation until February 11, at which time Harrow told him that National was "completely off these three accounts as of February the 6th, 1957." He did not recall Harrow asking him in that conversation not to cancel the National policy. The fire occurred later on that day.

Harrow testified that in the latter part of 1956, Rossi advised him that National would like to be relieved of the Apparel risk because of "claims experience." Harrow told Rossi he would attempt to place the insurance elsewhere. Rossi replied, "Let me know when you have accomplished this." Harrow was not able immediately to find a company that would take the identical risk as embodied in the National policy, but was offered limited coverage. Prior to February 5, 1957, Harrow talked to Rossi on several occasions, the substance of the conversations being as follows: "The basis of the telephonic communications both ways was with reference to temporary binders and coverages pending the decisions of the various insurance companies, whether they would issue policies as per the terms and conditions of the one that National Auto wanted to be relieved of." Harrow further stated: "When I would receive an offer of coverage from the various insurance companies, I would then call Mr. Rossi and tell him the amount of coverage that I had been offered, and that this risk is reduced by that amount that they are binding me for, and for the specific coverage they were willing to assume the risk on; and when the companies, after inspection, had phoned or written, as the case may be, that they could not accept any of it, then I called Mr. Rossi back and advised him that he was back on the risk because the binding companies have gone off the risk." Harrow further testified that: "Specifically, on February the 6th, after Mr. Geisen-

dorfer left my office, I called Mr. Rossi and told him that Mr. Geisendorfer of Deans & Homer had bound the three companies above-mentioned, and for the specific amounts and for all-risk commercial block; and that it was indeed fortunate that I could call him and tell him he was off the risk only because Mr. Geisendorfer had bound us with his carriers." Harrow, on cross-examination by counsel for Yorkshire, admitted that he had made the following statement in his deposition, and that such statement was true: "I told him [Rossi] that he was off the risk only because Mr. Geisendorfer was kind enough to bind us with the firm of Deans & Homer, and I further stated to him that I do not want these policies cancelled until I receive the policies from Deans & Homer, so that I could advise him the exact dates so that we could get the exact pro rata of return premiums for the policies that his firm, Kleiner, Fields & Burton had. And he said, 'How long would it take?' and I said, 'I have just been left applications by Mr. Geisendorfer so that they can determine the premium for these commercial block policies, and they would be forthcoming from Deans & Homer within the next few days.' "[6] In reply to a question as to his reason for telling Rossi not to cancel the National policy until he had a new policy, Harrow stated: "There are two reasons why it was done that way. One, to ascertain the exact return of the unearned premiums on the policy that will be cancelled; and the second is not to leave the assured without any coverage." He further testified that it was also his purpose to so handle the transaction that there would be no double-premium charge involved insofar as Apparel was concerned. Under examination by counsel for National, Harrow stated: "I told Mr. Rossi, in addition to the previous statement, that I did not want him to cancel the policy until I had the new policy in my hand, so that I could determine the exact date that the old policy, or National's policy, could be cancelled pro rata, so that there would not be a duplication of insurance.' "[7]

---

[6] At the end of such cross-examination, the following testimony was given: "Q. When you communicated with Mr. Rossi and told him of your discussion with Mr. Geisendorfer, did you not specifically tell him that you did not want the National policy canceled until you had received the Deans & Homer, some policy from Deans & Homer? A. Yes, sir."

[7] While being examined by counsel for National, Harrow admitted that he had testified in his deposition as follows: "A. I made a further statement to Mr. Rossi on the telephone with respect to the fact that he was to request the companies [sic] not to send out cancellation notices until

While being questioned by counsel for Apparel, Harrow testified as follows: "Q. In that conversation did you tell Mr. Rossi that he was not to cancel the policy until you actually had the Deans & Homer policies in your hands? A. Yes, sir. ... Q. By Mr. McBain: At that time did you tell him not to cancel so that you could be certain of the date that the National Auto policy would go off, and that it would be the same date that the Deans & Homer policy would show as effective? A. Yes, sir."[8] He further said that he told Rossi that it would be several weeks before he could possibly get the Deans and Homer policies, because the application had to be completed; he said, "Mr. Rossi, you know how long it takes to get a commercial block policy out."

As to the determination of premium refund, Harrow's testimony was: "Q. By Mr. Levit: Where there is a cancellation by replacement, and the broker or agent has advised the insurance company that he has obtained replacement coverage effective on a certain date, is that the custom then to figure the return of unearned premium from and after that date that the broker or agent has so advised the replacement coverage was effective? ... [A.] The answer is yes, providing that the company that is canceling the policy will receive the name of the company, the policy number, and the effective date of the new policy, either verbally or in writing."

It should also be noted at this point that Apparel's president testified as follows: "Q. At the time of the fire did you intend that Apparel have more than $100,000 commercial block insurance or fire insurance on its stock and equipment? The witness: No, sir. Q. By Mr. Levit [attorney for National]: Did you ever give Mr. Harrow any instructions at any time prior to the fire to increase such insurance over $100,000? A. No, sir." Prior to the fire, Apparel's president knew nothing of National's request that its policy be terminated.

It is, of course, clear that the concept of substitution is that one policy shall replace another rather than that there shall be additional insurance. In the present case, Apparel's president testified that he did not desire insurance coverage in

---

such time as I returned the policy, which I would only do when I received the actual policies from Deans & Homer, and I would advise him when I did receive them."

[8]Mr. Homer of Deans and Homer testified that it was customary in this field of insurance when a policy is issued to date it back to the date of the oral request for the insurance, but that that was not always done.

excess of $100,000. Moreover, Harrow wanted to avoid a double-premium charge. It would seem to be clear that the parties to a particular policy could provide that the cancellation of such policy should take place the moment other insurance coverage intended to replace that policy should become binding. (See *Continental Casualty Co.* v. *Giller Concrete Co.*, 116 F.2d 431, 433.) In the case last cited, the court said at page 433: ''A policy of insurance may be cancelled by mutual consent of the contracting parties notwithstanding a provision in the policy specifying a method of cancellation. [Citation.] In the case at bar Giller and Wright, as they had a right to do, mutually agreed to the cancellation of the policy of automobile liability insurance when Giller Company secured substitute coverage with another company. Prior to the happening of the accident on April 3, 1939, Giller Company had not secured substitute liability coverage with American Mutual Liability Insurance Company. . . . The minds of the parties never met and no substitute contract ever came into existence. The conditions upon which the cancellation of Continental's policy was to take effect never happened, and Continental's policy of insurance continued in full force and effect.'' While an inference might reasonably have been drawn from the evidence that the agreement between Apparel, acting through Harrow, and National, acting through Rossi, was that National's liability should cease immediately upon the coming into being of binding coverage by Yorkshire, the problem presented on appeal is whether there is substantial support in the record for the inference drawn by the trial court that coverage by both National and Yorkshire was in full force and effect at the time of the fire. (*Cf. Home Ins. Co., N.Y.* v. *Fidelity-Phenix Fire Ins. Co.*, 225 Iowa 36 [279 N.W. 425].) The crucial factor in such determination is the statement of Harrow that the cancellation of the coverage for Apparel and its related companies should not take place until policies had actually been received from Deans and Homer. The trial court was warranted in concluding that while Harrow wanted to avoid the hazard of double premiums, he wanted even more to avoid the hazard of a lack of coverage. Apparently Harrow hoped ultimately to agree with Rossi upon a date as of which such cancellation would be deemed effective so as to avoid a double-premium charge even though such procedure might be questionable in the light of the law relating to the charge for and collection of premiums, a matter

which is not presented for decision herein. Harrow's concern about what might prove to be premature cancellation was understandable because of his prior abortive attempts to obtain the broad coverage necessary to replace fully the insurance coverage afforded by Apparel's contract with National; until a formal policy should be delivered to him, there was the possibility that the new insurer might modify or withdraw its acceptance of the risk as evidenced by its oral binder. (*Cf. Norwich Union Fire Ins. Soc.* v. *Paramount F. Lasky Corp.,* 50 F.2d 747, 751.) Hence, unless such determination of the trial court is vitiated by certain rulings on the admissibility of evidence hereinafter discussed, this court is not free to interfere therewith. (See *Brewer* v. *Simpson,* 53 Cal.2d 567, 583 [349 P.2d 289] ; *New* v. *New, supra,* 148 Cal.App.2d 372, 383.)

Harrow testified that he received a call from Mr. Kleiner of Kleiner, Fields and Burton in which it was indicated that National wanted a deposition or statement from him. He signed a statement which was dated February 21, 1957. Part of paragraph 13 thereof was as follows: ''Also, phoned Mr. Rossi that he was off his policies on 2/6/57. I stated to Mr. Rossi on the telephone as follows: '*I am sorry that I couldn't get you off the risk sooner but I couldn't do so until I was able to obtain coverage elsewhere and it's because I got an oral binder from Mr. Geisendopher [sic] of Deans & Homer that I am able to call you back and advise you that you are off the risk.*'' (Emphasis added.) Under examination by counsel for National, Harrow was asked whether he had made the italicized statement to Rossi. An objection on the part of Yorkshire that as to it such statement would be hearsay was sustained. But the objection of Apparel on that ground was overruled, the court stating that such a statement would be one made by Apparel's agent. The witness answered that he did make the statement. His attention was then directed to paragraph 13 of his statement and he said that he had placed therein a reference to his conversation with Rossi. Counsel for National then attempted to ask him if the quoted words were the words set forth in the written statement. Yorkshire's objection was sustained. Apparel's objection that matter in the written statement made after the event was hearsay as to it was also sustained. National then made an offer of proof that ''if the witness were permitted to answer the question he would have testified that those words were contained in paragraph 13 of his statement of

February 21st, 1957. . . .'' Thereafter the objections of Yorkshire and Apparel were sustained to a further question which was as follows: ''The quoted language that I have just read from the statement of February 21, 1957, is the only reference in that statement, is it not, to your conversation with Mr. Rossi concerning the placing of the binder with Deans & Homer?'' National's offer of proof thereupon made was that the witness would answer, if permitted to do so, ''that there is nothing else in the statement of February 21, 1957, except the language . . . just read referring to this conversation with Mr. Rossi.'' However, thereafter counsel for National was permitted to question Harrow about testimony given in his deposition, as follows: ''Q. BY MR. LEVIT: Page 43, line 17, I now want you to look particularly at paragraph 13. Read it to yourself. May it be stipulated, counsel, that at paragraph 13 we are referring to Defendant's Exhibit A? MR. McBAIN: Yes. I will stipulate to that. I think I will object also to these questions that refer to a document that is not in evidence and has been rejected by the Court. I think maybe this is a left-handed attempt by counsel to get those statements into evidence. MR. LEVIT: No. There is nothing that I am reading that goes into the content of paragraph 13, your Honor. It is merely to get the continuity of what his next answer is. THE COURT: Objection overruled. Go ahead. MR. LEVIT (reading): 'Q. Are you now telling us that you said something else to Mr. Rossi in addition to that on that occasion? A. Yes, sir. Q. Now, what else did you say to him in this conversation that is referred to in paragraph 13? . . . A. I made a further statement to Mr. Rossi on the telephone with respect to the fact that he was to request the companies not to send out cancellation notices until such time as I returned the policy, which I would only do when I received the actual policies from Deans & Homer, and I would advise him when I did receive them. Q. Was that the extent of what you said to him? A. That is the gist.' ''

In considering the claim of error in the ruling with respect to the inquiry as to the written statement, we will assume to be correct National's premise that Harrow was not its witness at that point in the trial and that his testimony was, accordingly, subject to impeachment by it.[9] It is true that

---

[9]It is to be noted that with respect to the Harrow-Rossi conversations there is support for the view that Harrow was acting as the agent of Apparel and not as the agent of National. In *Sterling Fire Ins. Co.* v.

a statement which is hearsay, and hence not admissible to prove the truth of the matters therein asserted, may be admissible for the limited purpose of the impeachment of a witness who made the statement at a prior time. (*Estate of Russell*, 189 Cal. 759, 768 [210 P. 249] ;[10] see also *Peterson* v. *Peterson*, 121 Cal.App.2d 1, 8 [262 P.2d 613].) Moreover, as stated in 3 Wigmore on Evidence (3d ed.) § 1042: "A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. . . . There may be explanations, indicating that the person had in truth no belief of that tenor; but the conduct is 'prima facie' an inconsistency." (See *People* v. *Brophy*, 122 Cal. App.2d 638, 649 [265 P.2d 593] ; *Langan* v. *Pianowski*, 307 Mass. 149 [29 N.E.2d 700, 701] ; *Erickson* v. *Erickson & Co.*, 212 Minn. 119 [2 N.W.2d 824, 827] ; 98 C.J.S., Witnesses, § 586, p. 564.) The difficulty with National's position is that when the hearsay objections were made, National made no assertion that its purpose was limited to that of impeachment; hence National cannot predicate error on the ruling. As said in *Smith* v. *Fall River Joint Union High School Dist.*, 118 Cal.App. 673, at page 682 [5 P.2d 930] : "When error is predicated upon the rejection of evidence, it must appear that the reason for its admissibility which is urged in the appellate court was also presented to the trial judge. . . . Nowhere, in the instant case, did counsel for appellants state precisely what he offered to prove and the reasons why his evidence would be admissible."[11] (See also *Estate of*

*Comision Reguladora*, 195 Ind. 29 [143 N.E. 2, at pp. 4-5], the court said: "By the great weight of authority it is held that if a general insurance agent or broker is authorized by the insured to accept notice of a cancellation of one policy and to substitute a policy in another company therefor, the agent is acting only for the insured in waiving or accepting such notice of cancellation. That is, the agent acts for the insurance company when he issues or executes the contract of insurance, and for the insured when he accepts notice of cancellation and selects another company. The above is true only when the insured has authorized the agent to accept notice of cancellation and select another company."

[10]In the Russell case, the court said at page 768: "The statements contained in those letters were, of course, pure hearsay as against the appellants; were incompetent to prove any fact at issue herein, and were admissible in evidence only for the purpose of impeaching those witnesses."

[11]Compare the language of Mr. Justice Sloss in *Cripe* v. *Cripe*, 170 Cal. 91, at page 94 [148 P. 520]: "The additional point is made that the sustaining of an objection to questions like those under discussion will not furnish ground for reversal, in the absence of a statement indicating to the court the nature of the evidence sought to be elicited. But the rule

*Parkinson,* 190 Cal. 475, 476 [213 P. 259]; *Taliaferro* v. *Crola,* 152 Cal.App.2d 448, 450 [313 P.2d 136]; *Hession* v. *City & County of San Francisco,* 122 Cal.App.2d 592, 605 [265 P.2d 542]; *Costa* v. *Regents of University of California,* 116 Cal.App.2d 445, 462 [254 P.2d 85].)

 Aside from the failure to inform the court of the purpose of the offered evidence, it would appear that ultimately National substantially achieved its objective. In the course of the impeachment of Harrow by reference to his deposition, it became apparent that, *in addition* to what he had said in his written statement, he claimed at the trial that he had discussed with Rossi a delay of some nature as to the matter of cancellation and that, as to what exactly was said on that subject, there was a discrepancy between his testimony at the trial and his testimony at the time of his deposition. Consequently, even if there was error it does not appear to have been prejudicial.

 National asserts that there was undue restriction of the cross-examination of Harrow as to his intent and belief at the time of the crucial statements to Rossi as to the Deans and Homer coverage. The questions as to which objections were sustained, followed by offers of proof that the witness' answer would be in the affirmative, were as follows: Whether when he talked to Rossi, he "expected that any policy issued by Deans & Homer would show an effective date of February 6th, 1957"; whether he expected that "the premium charge for the Yorkshire policy would be computed starting as of February 6th, 1957"; whether he expected and believed at the time he talked to Mr. Rossi that at some later time he "would return the National Auto policy to them and obtain a refund of the unearned premium"; whether he expected and believed at the time of such conversation that the refund of premium on the National policy "would be calculated to show a refund of all premiums under the policy from and after February 6th, 1957"; whether, when he advised Rossi about the Deans and Homer coverage, it was his belief that that "coverage was effective as of February 6th,

thus invoked can have no application here, since the questions themselves were so framed as to show clearly the nature and purport of the declarations sought to be proved. Nor was the defendant called upon to explain the purpose for which the testimony was offered. *Such explanation may be necessary where testimony is admissible for a limited purpose only.* But here the declarations were admissible generally, and had a direct bearing on one of the main issues in the case." (Emphasis added.)

1957''; and whether it was his intention, at the time he dealt with Deans and Homer and at the time he told Rossi of the Deans and Homer coverage, ''to have only $100,000 commercial block coverage on the stock and equipment of Apparel.'' As it did in the trial court, National asserts that such inquiry, if permitted, would have thrown doubt on the truthfulness of Harrow's testimony that he requested Rossi not to cancel the National policy and that it would have shown that ''Harrow was referring only to the mechanics of calculating the return premium and was not requesting a continuation of the National policy until the Yorkshire policy was issued.'' It is further asserted that Harrow's belief and intent with respect to whether the Yorkshire coverage would replace the National policy or would be additional coverage, *''including his intention that Apparel have only $100,000 insurance,* would be relevant.''

There should, of course, be no undue restriction of cross-examination, particularly when it bears upon such a crucial matter as the conversation upon which the trial court had primarily to base its conclusion as to whether there had been a cancellation by mutual assent of the National policy prior to the fire. The Supreme Court said in *People* v. *Winston,* 46 Cal.2d 151, at page 157 [293 P.2d 40] : ''Although the extent of cross-examination on any 'fact which tends to impeach the credibility of a witness . . . rests very largely in the discretion of the trial court' (27 Cal.Jur., § 96, pp. 122-123), nevertheless considerable latitude should be allowed to show the witness' state of mind and possible bias.'' But, as in the Winston case, no prejudice appears to have resulted because other evidence covered the subject-matter of the attempted inquiry. As already noted, Harrow testified as to his caution in getting an unqualified statement from Geisendorfer on February 6, 1957, that there was immediate coverage for Apparel in the nature ''of all-risk commercial block'' in the amount of $100,000. He also testified as to the custom and practice with respect to what is stated in a policy as to its effective date where there has been a verbal binder; he said that ''the effective date of the policy should show the date that the binder became effective'' and that the ''premium charge'' would start '' [f]rom the effective date of the binder.'' The witness also explained that in referring to the effective date of the binder he meant ''the date that the insurance company accepted the risk either verbally

or by written binder,'' that is, when the representative of the insurance company orally or by written binder said that the risk was covered. With respect to the subject of the return of premium, under examination by counsel for National Harrow stated as follows: ''Q. By Mr. Levit: Where there is a cancellation by replacement, and the broker or agent has advised the insurance company that he has obtained replacement coverage effective on a certain date, is that the custom then to figure the return of unearned premium from and after that date that the broker or agent has so advised the replacement coverage was effective? . . . The witness: The answer is yes, providing that the company that is cancelling the policy will receive the name of the company, the policy number, and the effective date of the new policy, either verbally or in writing.'' The gist of Harrow's testimony throughout was that he wanted to replace the National policy rather than obtain additional insurance. However, as to his reasons for telling Rossi not to cancel the National policy until he had received a new policy, he testified as follows: ''There are two reasons why it was done that way. One, to ascertain the exact return of the unearned premiums on the policy that will be cancelled; and the second is not to leave the assured without any coverage.'' Furthermore, he testified as follows when examined by counsel for National: ''Q. By Mr. Levit: Now, you have testified to your purpose in connection with certain discussions you had with Mr. Rossi. Was it your purpose in handling this transaction, after you received Mr. Rossi's request to be relieved of further liability, that there be no lapse of coverage as far as the insured was concerned? . . . The witness: The answer is yes.'' He was then asked if it was also his purpose to so handle the transaction that there would be no double-premium charge for Apparel; his answer was in the affirmative. After the rulings of which complaint is made, under examination by counsel for Apparel, Harrow testified as follows: ''Q. By Mr. McBain: At that time did you tell him not to cancel so that you could be certain of the date that the National policy would go off, and that it would be the same date that the Deans & Homer policy would show as effective? A. Yes, sir. . . . Q. Didn't you tell him it would be several weeks before you could possibly get the policies, because the application had to be completed? A. Yes, sir.''

National also argues that Harrow had no authority to effect double coverage and that the record does not show any ratification by Apparel of double coverage. But it is clear from what has heretofore been said that there is substantial support in the record for the determination by the trial court that Harrow had authority to withhold Apparel's assent to the cancellation of the National policy until such time as a policy from Deans and Homer was actually in hand. Consequently, the subject of ratification need not be discussed.

Appellant National asserts that the trial court erred in determining that both insurers should contribute equally to the loss. The contention made is that if National's policy was in force it was excess insurance whereas Yorkshire's coverage was primary insurance. The National policy contained the following clause under the heading of "Other Insurance": "This policy does not cover to the extent of any other insurance whether prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly covering the same property, and this Company shall be liable for loss or damage only for the excess value beyond the amount due from such other insurance." National's argument is that the form of policy ordinarily used by Yorkshire was the "Bureau Block," which includes the provisions of the California Standard Form Fire Insurance Policy, one of which is as follows with respect to pro rata liability: "This company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not." (See Ins. Code, § 2071.) The applicable law is asserted by National to be that "where two policies cover a loss, one with an 'excess' clause and the other a 'pro rata' clause, the 'pro rata' policy is primary insurance and the 'excess' policy does not contribute to the loss until the primary insurance has been exhausted."

While some support may be found for National's position under the factual assumption upon which its argument is premised (see 5 Stan. L.Rev. 147, 149; 5 U.C.L.A. L.Rev. 157, 160; 29A Am.Jur., Insurance, § 1716; *cf. Pleasant Valley Ass'n.* v. *Cal-Farm Ins. Co.,* 142 Cal.App.2d 126, 136 [298 P.2d 109]; *Gillies* v. *Michigan Millers Mut. Fire Ins. Co.,* 98 Cal.App.2d 743, 748 [221 P.2d 272]), we are persuaded that the governing law is stated in *American Auto. Ins. Co.* v. *Seaboard Surety Co.,* 155 Cal.App.2d 192, in which the

court said, at pages 198-199 [318 P.2d 84] : "And the problem becomes one of adjusting the insurers' equities in the light of the 'other insurance' provisions of their respective policies.

"That of American provides for proration except in circumstances not here pertinent, as follows: 'If the insured has other insurance against a loss covered by this policy, the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; . . .' The Seaboard policy contains an excess clause as follows: 'In the event that there shall be in effect any other good, valid and collectible insurance insuring to the benefit of the insured, or any additional insured hereunder with respect to loss or claim covered hereby, then this insurance shall be excess insurance only, over and above the amount of any such other good, valid and collectible insurance.' The limits of the two policies are the same and substantially in excess of the amount of the Whaley judgment.

"This case lends itself to solution upon the basis of these policy provisions independently of the equities which in proper cases, as in subrogation instances, override the exact terms of the policies in the interest of substantial justice. The American provision renders it liable for its pro-rata portion of the loss, in this case one-half, and the insured after paying can collect that much and no more from that insurer. It was so held in *Fidelity etc. Co.* v. *Fireman's F. I. Co.*, 38 Cal.App. 2d 1, 5 [100 P.2d 364]. Hence the policy is to that extent 'good, valid and collectible' other insurance within the purview of the Seaboard policy, which in that event protects the insured with excess insurance 'over and above the amount of any such other good, valid and collectible insurance,'— namely to the extent of one-half of the total loss. This same result was reached, through imposing overriding equitable principles, upon consideration of conflicting prorate and excess clauses in *Air etc. Co.* v. *Employers' Liab. etc. Corp.*, 91 Cal.App.2d 129 [204 P.2d 647] ; *Peerless Cas. Co.* v. *Continental Cas. Co.*, 144 Cal.App.2d 617, 619-623 [301 P.2d 602] ; and *Canadian Indem. Co.* v. *Ohio Farmers Indem. Co.* (Dist. Ct. No. Dist. Cal.), 140 F.Supp. 437, 439.

"These considerations leave Seaboard liable for one-half of the Whaley judgment and the trial court so ruled." (*Cf. Peerless Cas. Co.* v. *Continental Cas. Co.*, 144 Cal.App.2d 617

[301 P.2d 602]; *Air Transport Mfg. Co.* v. *Employers' Liab. Assur. Corp.,* 91 Cal.App.2d 129 [204 P.2d 647].)

In the more recent case of *Firemen's Ins. Co.* v. *Continental Cas. Co.,* 170 Cal.App.2d 698, it was said, at pages 701-702 [339 P.2d 602]: "Thus, the holding [in *American Auto. Ins. Co.* v. *Seaboard Surety Co., supra,* 155 Cal.App.2d 192] is that if one policy provides for 'prorate' insurance in the event of other insurance, and the other provides for 'excess' insurance, the latter is liable for the amount of the loss over and above the 'prorate' share of the first policy. It should be noted that this was not a case involving liability insurance on a nonowned car on which 'excess' insurance was issued. It involved a conflict between two primary policies."

The judgment is affirmed. Each party, except Apparel Manufacturers' Supply Company, shall bear its costs on this appeal; Apparel Manufacturers' Supply Company shall recover its costs on this appeal from National Automobile and Casualty Insurance Company and Yorkshire Insurance Company of New York.

Shinn, P. J., and Vallée, J., concurred.

Petitions for a rehearing were denied March 27, 1961.